752 F.2d 373
 53 USLW 2382
 RAPID TRANSIT ADVOCATES, INC., a California non-profit
corporation; and Wilshire Homeowners Alliance, an
unincorporated association, Plaintiffs- Appellants,
v.
SOUTHERN CALIFORNIA RAPID TRANSIT DISTRICT; Urban Mass
Transportation Administration of the United States
Department of Transportation; Theodore Lutz, as
Administrator of the Urban Mass Transportation
Administration of the United States Department of
Transportation and Neil Goldschmidt, as Secretary of the
United States Department of Transportation, Defendants-Appellees.
RAPID TRANSIT ADVOCATES, INC., a California non-profit
corporation; and Wilshire Homeowners Alliance, an
unincorporated association, Plaintiffs- Appellants,
v.
SOUTHERN CALIFORNIA RAPID TRANSIT DISTRICT; Urban Mass
Transportation Administration, et al., Defendants-Appellees.
 Nos. 83-6149, 83-6150.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 6, 1984.
Decided Jan. 18, 1985.
 
 William D. Ross, Charles R. Hartman, III, Robert D. Donaldson, Rogers & Wells, Los Angeles, Cal., for plaintiffs-appellants.
 Joseph F. Butler, Asst. U.S. Atty., Los Angeles, Cal., Vincent J. Marella, Dorothy Wolpert, Nutter, Bird, Marella, Boxer, Wolpert & Matz, Beverly Hills, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before BROWNING, Chief Judge, GOODWIN and KENNEDY, Circuit Judges.
 PER CURIAM:
 
 
 1
 Appellants Rapid Transit Advocates and Wilshire Homeowners Alliance, organizations of residents and potential mass transit users in Los Angeles, California, challenge the decision of the Urban Mass Transit Administration (UMT Administration) to grant federal funds to the Southern California Rapid Transit District (District) to design and engineer a mass transit system for the City of Los Angeles. Appellants allege violations of various provisions of the Urban Mass Transportation Act (UMT Act), 49 U.S.C. Sec. 1601 et seq. (1982), and of the National Environmental Policy Act (NEPA), 42 U.S.C. Sec. 4321 et seq. (1982).
 
 
 2
 The district court granted appellees' motion for summary judgment, holding that a private cause of action under the UMT Act could not be implied, and that appellants had failed to demonstrate sufficient injury to confer standing to challenge agency action under the Administrative Procedure Act (APA), 5 U.S.C. Sec. 701 et seq. (1982). We affirm.
 
 I.
 
 3
 The UMT Act provides for federal assistance in the planning and development of local mass transit systems. 49 U.S.C. Sec. 1602. The Act was passed in 1964 following lengthy hearings at which numerous groups testified to the need for federal financial assistance to solve the serious national problem of inadequate public transportation in urban areas. See H.R.Rep. No. 204, 88th Cong.2d Sess. (1964), reprinted in 1964 U.S.Code Cong. & Ad.News 2569, 2570-80. The Act authorizes the Secretary of Transportation to make grants or loans to assist states and local agencies in financing the planning, development, construction and improvement of mass transportation facilities. 49 U.S.C. Sec. 1602(a)(1). The Act also forbids the Secretary from approving funds for a project unless stated restrictions and conditions have been met. See, e.g., 49 U.S.C. Secs. 1602(a)(2), (c)-(h); 1603(a); 1604(e), (h)-(j), (l )-(m); 1604a; 1606; 1609(a), (c); 1610(b)-(c); 1611(b).
 
 
 4
 The Act is administered by the UMT Administration, which operates under a delegation of authority from the Secretary of Transportation. See 49 C.F.R. Sec. 1.51 (1984). The Administration has developed a two-step procedure for reaching funding decisions. See the Administration's September 22, 1976 Statement of Policy, 41 Fed.Reg. 41,512-14 (1976). In the first stage, the local transit authority analyzes alternatives and prepares a "first-tier" environmental impact statement (EIS). Following this "alternatives analysis," the applicant designates the "preferred alternative" it proposes to implement. A public hearing is then held. Following the hearing the UTM Administration may grant federal funds to the local applicant for design and engineering of the preferred alternative.
 
 
 5
 The second stage follows completion of the preliminary design and engineering plan. The applicant prepares a site-specific, "second-tier" EIS analyzing the effects of the chosen alternative. After the UMT Administration circulates the final EIS for comments, the applicant prepares a capital grant application for the construction of the preferred alternative and holds a public hearing thereon. The UMT Administration then decides whether to provide funds for the actual construction of the transit system.
 
 
 6
 The grant of funds for the preliminary design and engineering phase at the conclusion of the first stage is explicitly independent of the action taken at the conclusion of the second stage; approval by the UMT Administration of a grant for design and engineering of the preferred alternative does not commit the Administration to approve the final design or to fund construction.
 
 
 7
 The District conducted a study of various alternatives for mass transit in the Los Angeles area, prepared a first-tier EIS, held public hearings, and selected a preferred alternative--the Wilshire Subway (Alternative II). The UMT Administration granted the District 12 million dollars for the preliminary design and engineering phase of the Wilshire Subway. The Administration has not approved funding for the actual construction of the project.
 
 II.
 
 8
 A. Implied Private Right of Action Under the UMT Act
 
 
 9
 The Act does not expressly authorize private suits to challenge violations of its requirements. The principles applicable in this situation are well-settled. Whether a private right of action should be implied is a matter of statutory construction; the ultimate question is simply whether Congress intended to create a private remedy. Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); Osborn v. American Ass'n of Retired Persons, 660 F.2d 740, 742 (9th Cir.1981). In determining Congressional intent, the language of the statute and its legislative history should first be examined. California v. Sierra Club, 451 U.S. 287, 297-98, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981); Transamerica Mortgage Advisors, 444 U.S. at 23-24, 100 S.Ct. at 249; Osborn, 660 F.2d at 742. If they do not suggest the Act was intended to create federal rights for the especial benefit of a particular class of persons, it is unnecessary to inquire into such other factors as whether availability of a private remedy would further the statutory purpose. See California v. Sierra Club, 451 U.S. at 297-98, 101 S.Ct. at 1781.
 
 
 10
 The Supreme Court has drawn a distinction between statutes whose language focuses on a right granted to a benefitted class of persons--where a private cause of action is generally found--and statutes framed as a "general prohibition or command to a federal agency"--where a cause of action is seldom implied. In Universities Research Ass'n, Inc. v. Coutu, 450 U.S. 754, 772, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981), the Court declined to imply a private right of action under the Davis-Bacon Act, which requires contracts for government work to contain minimum wage stipulations, because, though clearly intended to benefit employees, the statute did not confer rights directly on the employees but instead imposed obligations on federal contracting agencies. In the words of the Court, the statute was "simply 'phrased as a directive to federal agencies engaged in the disbursement of public funds.' " 450 U.S. at 772, 101 S.Ct. at 1462, quoting Cannon v. University of Chicago, 441 U.S. 677, 693 n. 14, 99 S.Ct. 1946, 1955 n. 14, 60 L.Ed.2d 560 (1979). Our decision in Osborn is to the same effect. See 660 F.2d at 744. Conversely, in Cannon, the Supreme Court found a private right implied in statutory language focusing explicitly on the civil rights of benefitted persons. The Court noted "[t]here would be far less reason to infer a private remedy ... if Congress ... had written it simply as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices." Cannon, 441 U.S. at 690-93, 99 S.Ct. at 1954-55.
 
 
 11
 The provisions of the UMT Act appellants allege were violated do not focus on the rights of particular persons but on the duties of the federal administrators of the program and of the applicants for assistance. The first of these provisions, section 2(b)(2), 49 U.S.C. Sec. 1601(b)(2), simply states that one of the purposes of the Act is to encourage the planning and establishment of areawide urban mass transportation systems needed for economical and desirable urban development. Appellants apparently contend that the initial design and engineering grant by the UMT Administration to the District is inconsistent with this purpose. We agree with the district court that this provision merely identifies the general purposes of federal aid to local transit authorities. It does not purport to confer on local residents private rights in the development of mass transit systems.
 
 
 12
 Appellants claim appellees violated the requirement of sections 3(d)(2) and (3) of the UMT Act, 49 U.S.C. Sec. 1602(d)(2) and (3), that each grant application certify that the applicant has considered the economic and social effects of the project and its impact on the environment, and has found the project to be consistent with official plans for the comprehensive development of the urban area. Although these subsections impose duties upon grant applicants for the benefit of the public, we agree with the district court that they focus not on the substantive rights of local residents but rather on the obligations of applicants and the Secretary. They are primarily spending directives to the Secretary of Transportation, specifying conditions under which grants may be made.
 
 
 13
 Appellants contend appellees violated section 5(1) of the UMT Act, 49 U.S.C. Sec. 1604(1), which provides "The Secretary shall not approve any project under this section unless he finds that such project" meets certain specified criteria. This provision, even more explicitly than those previously mentioned, is stated as a directive to the Secretary of Transportation, not as a grant of substantive private rights enforceable in private litigation.
 
 
 14
 The same is true of sections 14(b)-(c) of the UMT Act, 49 U.S.C. Secs. 1610(b)-(c), also allegedly violated, which provide that "The Secretary shall review" the transcript of hearings held under section 3(d)(1) to assure that an adequate opportunity was afforded for the presentation of views on listed subjects by all parties with a significant economic, social, or environmental interest, and that "The Secretary shall not approve any application unless he finds in writing" that specified conditions have been satisfied.
 
 
 15
 The parties agree that the legislative history is silent as to whether Congress intended to create a private right of action. Congressional silence is not necessarily fatal to implication of a private cause of action, Transamerica Mortgage Advisors, 444 U.S. at 18, 100 S.Ct. at 246, but "implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best." Touche Ross & Co. v. Redington, 442 U.S. 560, 571, 99 S.Ct. 2479, 2486, 61 L.Ed.2d 82 (1979). Where, as here, the language of the statute does not itself support an implied private cause of action, a silent legislative history obviates the need to inquire further into congressional intent. Osborn, 660 F.2d at 745. In such cases, "[t]he question whether Congress ... intended to create a private right of action, has been definitely answered in the negative." Touche Ross, 442 U.S. at 576, 99 S.Ct. at 2489. See also Osborn, 660 F.2d at 745.
 
 
 16
 The cases relied upon by appellants, Cohen v. Massachusetts Bay Transportation Authority, 647 F.2d 209 (1st Cir.1981) and Stavisky v. Metropolitan Transit Authority, 533 F.Supp. 1146 (E.D.N.Y.1982), are distinguishable. Both involve section 5(i)(3) of the UMT Act, 49 U.S.C. Sec. 1604(i)(3), which is not at issue here. Existence of a private right under one section of the UMT Act does not mean such a right exists under other sections of the Act. Dopico v. Goldschmidt, 687 F.2d 644, 646-47 (2d Cir.1982). Section 5(i)(3) requires a recipient of federal funds to assure the Secretary there will be no changes in fare or substantial changes in service unless and until there have been public hearings on the proposed changes following adequate public notice. Arguably section 5(i)(3) reflects a congressional focus on a particular benefitted class--the actual riders of an existing mass transit system. In contrast, the sections relied upon by appellants do not purport to deal with rights or benefits of any particular group of individuals.
 
 B. Standing to Sue Under the APA; Ripeness
 
 17
 Though appellants cannot sue directly under the UMT Act, "[a] plaintiff need not establish a private right of action under a statute before it may sue under the APA." Oregon Environmental Council v. Kunzman, 714 F.2d 901, 903 (9th Cir.1983), quoting Glacier Park Foundation v. Watt, 663 F.2d 882, 885 (9th Cir.1982). See also Chrysler Corp. v. Brown, 441 U.S. 281, 317, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). To obtain judicial review of agency action under the APA, however, appellants must satisfy the standing requirement of section 10 of the APA, 5 U.S.C. Sec. 702.
 
 
 18
 To have standing under the APA, a plaintiff must establish that the agency action caused him an "injury in fact" and that this injury is "arguably within the zone of interests to be protected or regulated" by the statute that the plaintiff claims the agency violated. Association of Data Processing Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970); Port of Astoria, Oregon v. Hodel, 595 F.2d 467, 474 (9th Cir.1975). To satisfy the case or controversy requirement of Article III, the injury must be distinct and palpable, concrete and immediate, and not merely abstract, conjectural or hypothetical. Allen v. Wright, --- U.S. ----, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); City of Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983); O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); Port of Astoria, 595 F.2d at 474.
 
 
 19
 The related requirement that litigation be deferred until a controversy is "ripe" for judicial resolution, also embodied in section 10 of APA, seeks "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). See Pence v. Andrus, 586 F.2d 733, 736-39 (9th Cir.1978).
 
 
 20
 In this instance the only decision that has been made is that the UMT Administration will partially fund preliminary design and engineering work. Neither this decision nor the design and engineering work that will follow will have any impact upon appellants in and of themselves. The threat that such an impact will eventually occur is neither immediate nor certain. The UMT Administration has explicitly disavowed any advance commitment to approve construction. The design and engineering work is still in progress. When it is completed, a second-tier EIS must be prepared, a hearing must be held, and various other statutory and regulatory conditions must be satisfied before the Administration can make a decision on funding. The process may never be completed; the Wilshire Subway may never be funded. If it is, appellants' present objections can be raised and fully considered in a suit to review the agency's final action in the light of then existing circumstances. See National Wildlife Federation v. Goldschmidt, 677 F.2d 259 (2d Cir.1982).[1]
 
 
 21
 Contrary to appellants' contention, this analysis is not affected by the fact that Congress has since appropriated funds for construction of a metro rail project by the District. See H.R. 3329, P.L. 98-78, 97 Stat. 453. The procedures required by the Act, including final approval by the Secretary, must be accomplished before construction can begin.
 
 
 22
 United States v. Students Challenging Regulatory Agency Procedures ("SCRAP"), 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), is also distinguishable. When suit was filed in SCRAP, the Interstate Commerce Commission had already committed itself to the challenged rate increase. Id. at 677-78, 93 S.Ct. at 2410-11. Similarly, the Secretary of Interior had already issued the final notice of sale of oil leases challenged in California v. Watt, 683 F.2d 1253, 1270-71, rev'd on other grounds, 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984); and the Army Corps of Engineers had already issued the permit allowing construction of power lines across wetlands and over navigable waters, attacked in Save Our Wetlands, Inc. v. Sands, 711 F.2d 634, 639 (5th Cir.1983).
 
 
 23
 Appellants also fail to satisfy the requirements for taxpayer standing established in Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), since they do not challenge the exercise of congressional power, but rather a decision by the executive branch. See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 479, 102 S.Ct. 752, 762, 70 L.Ed.2d 700 (1982).
 
 
 24
 Since no federal claim remained, the district court properly dismissed the pendent state claims and properly refused permission to amend the complaint to allege additional claims under state law. See United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); Townsend v. Columbia Operations, 667 F.2d 844, 850 (9th Cir.1982).
 
 
 25
 Affirmed.
 
 
 
 [1]
 Friedman Brothers Investment Co. v. Lewis, 676 F.2d 1317 (9th Cir.1982), cited by appellants, is distinguishable. In Friedman Brothers, plaintiff landowner alleged that the UMT Administration and the City of Torrance violated NEPA by not issuing an EIS in conjunction with the UMT Administration's grant of funds to the City for the purchase of Friedman's land. Even though the UMT Administration had not yet made a final commitment to fund construction of a bus depot on plaintiff's land, the court found the issue ripe for decision because the agency had "spoken its last word on the project's environmental impact" by exempting the City from issuing an EIS. 676 F.2d at 1319. The court therefore found it appropriate to resolve the adequacy of the UMT Administration's environmental assessment, even though other aspects of the agency action were not yet complete. In this case, by contrast, the UMT Administration has not "spoken its last word" on the project's environmental impact. See also United States v. Louisiana-Pacific Corp., 569 F.Supp. 1141, 1147-48 (D.Or.1983) (distinguishing Friedman Brothers )