**FRIENDS OF POTTER MARSH and the Anchorage Coastal Wildlife Refuge, Inc.,; Wayne Pichon; Jim and Nora Arnesen; Deanna and Joe Essert; Robert B. Gillam; Deborah Kyzer and Karen Kyzer, and Peryll Kyzer; David Lee; Mark and Sherrie Richey; and Ed and Mary Whitmore, Plaintiffs,**

v.

**Mary E. PETERS, in her official capacity, Administrator, Federal Highway Administration, David C. Miller, in his official capacity, Division Administrator, Federal Highway Administration, and Norman Y. Mineta, in his official capacity, Secretary, U.S. Department of Transportation, Defendants.**

No. A04–0171 CV(RRB).

United States District Court,
D. Alaska.

May 27, 2005.

*ORDER GRANTING DEFENDANTS'*
*MOTION TO DISMISS*

BEISTLINE, District Judge.

## I. INTRODUCTION

Before the Court are Defendants Mary E. Peters, in her official capacity, Administrator, Federal Highway Administration, David C. Miller, in his official capacity, Division Administrator, Federal Highway Administration, and Norman Y. Mineta, in his official capacity, Secretary, U.S. Department of Transportation ("Defendants"), with a Motion to Dismiss the Plaintiffs' action "for lack of final agency action, lack of ripeness, and lack of standing."[1] Plaintiffs Friends of Potter Marsh and the Anchorage Coastal Wildlife Refuge, Inc., Wayne Pichon, Jim and Nora Arneson, Deanna and Joe Essert, Robert B. Gillam, Deborah, Karen, and Peryll Kyzer, David Lee, Mark and Sherrie Richey, and Ed and Mary Whitmore ("Plaintiffs") oppose and argue that the agency actions were final, the causes of action are ripe, and that they have standing.[2]

Because the Court concludes that there was not a final agency action and the complaint is not ripe, Defendants' Motion to Dismiss is **GRANTED**.

## II. FACTS

This action arises out of actions taken at the request of the Municipality of Anchorage, by the U.S. Department of Transportation, to evaluate the environmental impacts of extending the existing Tony Knowles Coastal Trail from its terminus at Kincaid Park to the Potter Weigh Station along the Seward Highway (the "Southern

---

1. Clerk's Docket No. 7 at 1.

2. Clerk's Docket No. 31 at 1.

Extension").[3] In 1999, a notice of intent to prepare an Environmental Impact Statement ("EIS") was published.[4] The draft EIS was published on November 11, 2002.[5] The draft EIS considers six action alternatives and a no-action alternative.[6] The final EIS has yet to be issued. Before it is issued, the draft EIS must be circulated for public comment.[7] This may result in modifications to the proposed action.[8] Then, the lead federal agency chooses a preferred alternative and issues the final EIS.[9] There is then another opportunity for public comment.[10] If there is no need for a supplemental EIS, the agency then issues a Record of Decision selecting the final alternative.[11] The Municipality of Anchorage apparently has the right to discontinue the project at any point in this process.[12]

Here, only the draft EIS has been completed. In the current action, Plaintiffs assert five causes of action under the Administrative Procedure Act ("APA"). Each cause of action alleges that a specified agency action definitively and erroneously interpreted or implemented the relevant statute. The causes of action include: (1) the Federal Highway Administration's ("FHWA") guidance regarding bicycle projects for transportation does not conform to 23 U.S.C. § 217(i);[13] (2) the Secretary of Transportation's waiver for "transportation enhancement activities" is not authorized by 23 U.S.C. § 133©;[14] (3) the FHWA guidance regarding section 4(f) interpreted it incorrectly;[15] (4) the FHWA approval of Anchorage's FFY 2004–2006 Transportation Improvement Program was erroneous because the project does not relate to surface transportation, is recreational, and does not qualify as a transportation enhancement activity;[16] and (5) the FHWA approval of the Transportation Improvement Program was erroneous because the project is not on or proximate to a road.[17]

## III. STANDARD OF REVIEW

A Rule 12(b)(1) motion may raise a facial or factual challenge to the court's subject matter jurisdiction.[18] A facial challenge is directed at the legal sufficiency of a claim.[19] The burden of proof is on the party asserting jurisdiction.[20] When assessing a Rule 12(b)(1) facial challenge

3. Clerk's Docket No. 6 at SUM–1.

4. *Id.*

5. *Id.*

6. *Id.* at Figure 2.5.

7. 40 C.F.R. § 1503.1.

8. 40 C.F.R. § 1503.4(a)(1).

9. 40 C.F.R. § 1503.3.

10. 40 C.F.R. § 1502.19(d).

11. 40 C.F.R. § 1505.2.

12. The Municipality, although not a party hereto, funded the existing trail and sought federal assistance and funding to complete it. The Municipality could also decide to forego federal funding, and thus also bypass the regulations accompanying such funding. Clerk's Docket No. 16 at 12 n. 3.

13. Clerk's Docket No. 1 at ¶¶ 64–67.

14. *Id.* at ¶¶ 76–79.

15. *Id.* at ¶¶ 87–88.

16. *Id.* at ¶¶ 97–98.

17. *Id.* at ¶ 104.

18. 2 James W. Moore, Moore's Federal Practice, § 12.30[4] at 12–38 (3d ed. 1977) ("Moore").

19. *Id.*

20. 5A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure, § 1340, at 226 (2d ed. 1990) ("Wright").

to the court's subject matter jurisdiction, the non-moving party receives the same protections as those under a Rule 12(b)(6) motion, and the court applies a standard comparable to that used for Rule 12(b)(6) motions.[21] The court "will accept the [non-moving party's] allegations as true, construing them most favorably to the [non-moving party], and will not look beyond the face of the complaint to determine jurisdiction."[22] However, the court "may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction."[23] The court will not dismiss a claim under 12(b)(1) unless it appears without any merit.[24]

## IV. DISCUSSION

### A. Final Agency Action

Defendants argue that the Court lacks jurisdiction because there was not a final agency action.[25] As a general rule, actions taken by federal administrative agencies are subject to judicial review.[26] However, federal jurisdiction is "lacking when the administrative action in question is not 'final' within the meaning of 5 U.S.C. § 704."[27] The APA provides:

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.[28]

Thus, the Court must find that FHWA's actions were final, or it does not have jurisdiction.

There are two requirements for an agency action to be final. The Supreme Court of the United States held:

As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process,—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."[29]

By contrast, "the Supreme Court has defined a nonfinal agency order as one that does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action."[30]

■ Here, the issuance of the draft EIS is not a final agency action.[31] Plaintiffs

21. Moore, *supra*, § 12.30[4] at 12–38 n. 12.

22. Moore, § 12.30[4] at 12–38—12–39.

23. *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir.1988).

24. Moore, § 12.30[4] at 12–38 n. 12.

25. Clerk's Docket No. 7 at 4.

26. 5 U.S.C. § 706.

27. *National Parks Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir.2003).

28. 5 U.S.C. § 704. Plaintiffs cite no statute authorizing review of non-final action applicable to this case.

29. *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

30. *National Parks Ass'n*, 324 F.3d at 1237 (citation and internal quotations omitted).

31. Plaintiffs argue that NEPA and its processes are irrelevant because the draft EIS is not the subject of the cause of action, but merely evidence of Defendants' erroneous interpretations of federal laws. Clerk's Docket No. 12 at 3. However, this case is only before the Court because the action alternatives in the draft EIS relied on the two guidances and the Secretary of Transportation's waiver. *Id.* at 6. Thus, the guidances and the waiver must be examined in that context, and the lack of a final EIS is relevant to the Court's analysis.

attempt to characterize their claims as "final administrative words" that took "definitive positions".[32] However, this does not meet the test for final agency action regarding any of Plaintiffs five claims.

### 1. FHWA Guidance—Bicycle and Pedestrian Provisions of Federal Transportation Legislation

■ FHWA issued the Bicycle and Pedestrian Provisions of Federal Transportation Legislation Guidance ("Bicycle Guidance") in February of 1999.[33] This guidance interprets 23 U.S.C. § 217(i), the Transportation Equity Act for the 21st Century.[34] Plaintiffs object to it because the guidance omits the requirement that the project must be principally for transportation.[35] The guidance states:

> TEA–21 retains the requirement that bicycle projects be "principally for transportation rather than recreation purposes", with the exception of the Recreational Trains program under which projects should be for recreational use. FHWA has determined that to meet the "transportational purpose" requirement, a bicycle facility must be more than a closed loop trail with a park that can only be used for recreational purposes— users must be able to get somewhere other than back to their starting point. Beyond this, any bicycle facility providing access from one point to another can and will be used for transportation purposes and is therefore eligible for funding under TEA–21.[36]

The Court does not have an opinion on whether this interpretation of the statute is correct because this guidance is not a final agency action.

■ First, to be final, the action must mark the consummation of the agency's decision-making process, and cannot be tentative or interlocutory in nature.[37] The Bicycle Guidance does not do this. As stated by Plaintiffs, FHWA guidances merely "assist [states and municipalities] in planning projects which use federal funds administered by Defendants." [38] Thus, guidances do not consummate the decision-making process, they are merely steps relied on to reach a decision. Even if Plaintiffs are correct that FHWA misinterpreted the statute, an erroneous legal interpretation at one stage in the process is not a final agency action. There is still ample time in the process for the agency to change or modify its interpretation. Also, even though Plaintiffs allege that these erroneous allegations "promote unlawful EIS alternative routes and rejection of lawful routes," it remains possible that the final agency action could be a lawful route, even under Plaintiffs' interpretation.[39] With no alternative yet chosen, the Court will not presume that the agency will choose an unlawful alternative.

Further, the claim also fails under the second prong of the test because the final action must be one by which rights or obligations have been determined or from which legal consequences flow.[40] This guidance document has no legal effect, it merely summarizes what the agency be-

---

**32.** Clerk's Docket No. 12 at 10–11.

**33.** Clerk's Docket No. 1 at Ex. 2 at 3.

**34.** *Id.*

**35.** *Id.* at ¶ 21.

**36.** *Id.* at Ex. 2 at 3.

**37.** *Bennett v. Spear,* 520 U.S. 154, 177, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

**38.** Clerk's Docket No. 1 at ¶ 20.

**39.** It is also possible that the final agency action could be a decision that no action should be taken.

**40.** *Bennett,* 520 U.S. at 177, 117 S.Ct. 1154.

lieves the law to be. The guidance does not enforce an interpretation of the law. Unlike in *Bennett*, there are no legal consequences should the agency choose to reject the legal interpretation provided in the guidance.[41] In fact, the guidance does not impose any obligations or harm on the Plaintiffs, and cannot do so until an action alternative is selected that relies on this guidance. There are no immediate consequences from the Bicycle Guidance.

■ Plaintiffs argue that the guidance had legal consequences because it modified the eligibility of the State and Municipality of Anchorage to obtain federal funding used in the planning and NEPA processes.[42] However, the expenditure of funds for preparation of NEPA documents and other planning purposes does not create final reviewable agency action.[43]

### 2. FHWA Final Guidance: Transportation Enhancement Activities

FHWA issued the Final Guidance: Transportation Enhancement Activities in December of 1999.[44] Plaintiffs object to two parts of this guidance: the Section 4(f) Guidance and the Secretary of Transportation's waiver concerning transportation enhancement activities. First, in the Section 4(f) Guidance, the agency incorporated and reissued FHWA's prior guidance on Section 4(f) which bars Defendants from funding a project that uses park land if there is a feasible and prudent alternative.[45] Plaintiffs object to the guidance because it allows an exception for bikeways that go through parks.[46] The guidance states: "A bikeway constructed in a park in a case where the bikeway is under the park agency's jurisdiction would not be a 4(f) use since the parkland is not permanently incorporated into a transportation facility, but continues to function as parkland."[47] The Court does not have an opinion on whether this exception to the statute is correct because this guidance is not a final agency action.

■ This guidance fails to be final agency action for the same reasons as the Bicycle Guidance failed to be final agency action. As with the Bicycle Guidance, the Section 4(f) Guidance is merely one step relied on to reach a decision. Even if the guidance misinterpreted Section 4(f), there is still time for the agency to change or

---

**41.** *See id.* at 169–70, 117 S.Ct. 1154 (finding that an agency who disregards the Biological Opinion was subject to potential civil and criminal liability).

**42.** Clerk's Docket No. 1 at ¶¶ 36–37.

**43.** *See Rapid Transit Advocates, Inc. v. Southern California Rapid Transit District*, 752 F.2d 373, 378–79 (9th Cir.1985) (deciding to fund preliminary design and engineering work is not a final decision because final approval by the Secretary is still required before construction can begin); *Environmental Defense Fund, Inc. v. Johnson*, 629 F.2d 239, 241 (2d Cir. 1980) ("Even if [federal] funds are made available, the proposed Phase I Study may reaffirm the HRP, reform it, or even recommend that it not be constructed. We are asked to intervene in an administrative process which at this point has created no rights or obligations and involves no legal conse-

quences... We conclude that no final agency action has been taken, that the issues are not ripe for adjudication and that our intervention would not only be a waste of judicial resources but an untoward interference in the administrative process.").

**44.** Clerk's Docket No. 1 at Ex. 3 at 43.

**45.** *Id.* Section 4(f), or 23 U.S.C. § 138, provides that the Secretary of Transportation shall not fund construction of highways that would "use" parkland, unless the Secretary finds that there is no feasible and prudent alternative to the use of such land and that all possible planning to minimize harm to such parkland have been undertaken.

**46.** *Id.* at ¶¶ 86–88.

**47.** *Id.* at Ex. 3 at 43.

modify its interpretation, or even not need to rely on this interpretation. Additionally, this guidance has no legal effect, it merely summarizes what the agency believes the law to be. The Section 4(f) Guidance imposes no obligations or harm on the Plaintiffs, and cannot do so until an action alternative is selected relying on this guidance.

■ Second, the Secretary of Transportation waived the restriction from 23 U.S.C. § 133© that Surface Transportation Program projects not be located on local roads or rural minor collectors for "transportation enhancement activities." [48] Plaintiffs object to this waiver because section 133© does not create such an exception, nor does it give the Secretary the authority to create such an exception. [49] The Court does not express an opinion on whether this waiver is valid because the waiver is not a final agency action.

The waiver by the Secretary of Transportation fails to be final agency action for the same reasons as the two guidances failed to be final agency action. It is not the consummation of the agency's decision-making process, has no force of law with penalties for noncompliance, and does not authorize any sort of action. Even if Plaintiffs are correct that the waiver is invalid, an erroneous legal interpretation at one stage in the process is not a final agency action. There is still time for the Secretary to change or modify the waiver, issue an individualized waiver, or the agency may not need to rely on the waiver. The waiver imposes no obligations or harm

on the Plaintiffs, and cannot do so until an action alternative is selected relying on this guidance.

### 3. FHWA's approval of Anchorage's FFY 2004–2006 Transportation Improvement Program with respect to the Southern Extension

In December of 2003, FHWA approved Anchorage's FFY 2204–2006 Transportation Improvement Program ("TIP"). [50] The TIP lists the Southern Extension as a "transportation enhancement activity." [51] First, Plaintiffs object that the Southern Extension does not qualify as such an activity because it relates to recreation, not transportation. [52] Second, Plaintiffs argue that even if this project were transportation-related, it is not eligible for Surface Transportation Program funds because it is not "on" a road for purposes of 23 U.S.C. § 133©. [53]

■ FHWA's approval of the TIP was not final agency action. First, the action was not the consummation of the agency's decision-making process. [54] The TIP does not contain any decision to fund particular projects listed in the TIP, or any decision that any projects are eligible for funding under the program listed in the TIP. Rather, all FHWA does regarding the TIP is find (1) that the TIP "is based on a continuing, comprehensive transportation process carried on cooperatively by the States, MPOs [Metropolitan Planning Organization] and transit operators in accordance with the provisions of 23 U.S.C. 134

---

48. *Id.* at Ex. 3 at 48–49. 23 U.S.C. § 133(c) provides that "Except as provided in subsection (b)(1), surface transportation program projects ... may not be undertaken on roads functionally classified as local or rural minor collectors, unless such roads are on a Federal-aid highway system on January 1, 1991, and except as approved by the Secretary."

49. *Id.* at ¶ 77.

50. Clerk's Docket No. 1 at Ex. 4.

51. *Id.* at Ex. 5 at 1.

52. *Id.* at ¶ 24.

53. *Id.*

54. *Bennett v. Spear*, 520 U.S. 154, 177, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

and section 8 of the Federal Transit Act" (49 U.S.C. app. 1607) and (2) that the TIP "conforms with the adopted SIP [State Implementation Plan] and that priority has been given to the timely implementation of transportation control measures contained in the SIP in accordance with 40 CFR part 51."[55] Thus, FHWA's approval of the TIP is a finding that a planning process is in place and that the TIP is consistent with State plans for air pollution abatement. There is no final decision regarding whether the Southern Extension can be built or which programs it would qualify for. Approval of the TIP is merely one step in the process of planning whether to build the Southern Extension.

Finally, the Court is unaware of any authority that suggests that agency actions contained within a draft EIS can constitute final agency action. It is therefore premature to act at this time or to provide advisory opinions with regard to the various possible routes. Absent a final decision to proceed on a specific identifiable route, the Court lacks jurisdiction in the matter.

## B. Ripeness

Although the lack of final agency action is dispositive, the Court will also address the argument that this case is not yet ripe.

▋ The ripeness doctrine is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."[56] The Court must evaluate "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."[57] To do so, the Court must consider "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented."[58]

▋ First, the Court considers whether delaying judicial review of the Southern Extension would cause hardship to Plaintiffs. To show hardship, Plaintiffs must show "adverse effects of a strictly legal kind."[59] There is not sufficient hardship if the actions challenged by Plaintiffs "do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations."[60] As discussed earlier, none of the actions challenged by Plaintiffs requires them to do anything or refrain from doing anything. The Guidances, waiver, and TIP approval have not led to any actual construction of the Southern Extension. All they have done is continued the planning process. Further, none of these actions subject anyone to civil or criminal liability. As in *Ohio Forestry Association,* before any action can be taken, many more steps must be taken by FHWA. Thus,

**55.** 23 C.F.R. § 450.330. The SIP is the State's plan for the abatement of air pollution developed in accordance with the provisions of 40 C.F.R. part 51.

**56.** *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

**57.** *Id.*

**58.** *Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998).

**59.** *Id.*

**60.** *Id.*

allowing Plaintiffs "ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain." [61]

Plaintiff Deborah Kyzer alleges that delaying judicial review causes her harm as she negotiates to sell an interest in land.[62] Four of the draft EIS alternatives would take by condemnation some of her property.[63] As a result, prospective buyers have indicated that a purchase price would negatively take into account a possible condemnation of part of the property.[64] However, this argument has been foreclosed by the Supreme Court of the United States.[65] In *National Park Hospitality Association,* the plaintiffs challenged a regulation interpreting the Contract Disputes Act as not being applicable to National Park Service concession contracts.[66] The plaintiffs argued that delaying judicial resolution of the issue would cause harm because applicability of the Act is a factor considered when a concessioner prepares its bid for a concession contract.[67] The Supreme Court rejected this argument, reasoning that if they accepted this argument, "courts would soon be overwhelmed with requests for what essentially would be advisory opinions because most business transactions could be priced more accurately if even a small portion of existing legal uncertainties were resolved." [68]

Plaintiffs also allege harm caused by delaying judicial review because growth in South Anchorage may eliminate potential routes for the Southern Extension. According to Plaintiffs, there are no "new" routes to discover, and the current alternatives are in danger of eroding or disappearing with development.[69] Thus, delaying judicial resolution of Plaintiffs claims "is detrimental to all who desire a trail because ... [it] entails more deterioration of routes and probably more condemnations than predicted in the [draft EIS]." [70] However, the NEPA process itself is not designed to be a quick process. NEPA's purpose is "to insure that environmental issues are given proper consideration in the decisionmaking process." [71] As such, the harm alleged by Plaintiffs is one inherent in the agency following the procedures required by NEPA. Thus, if any possibility of development was sufficient to establish ripeness, there would be constant interference in the agency process.

Second, the Court considers whether the challenges are fit for judicial review. This includes considering whether judicial intervention would inappropriately interfere with further administrative action and whether the courts would benefit from further factual development of the issues presented. Here, there is no question that judicial intervention would interfere with FHWA's process of complying with

---

61. *Id.* at 734, 118 S.Ct. 1665.

62. Clerk's Docket No. 12 at Ex. 3.

63. *Id.*

64. *Id.*

65. *National Park Hospitality Ass'n v. Dept. of the Interior,* 538 U.S. 803, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003).

66. *Id.* at 805, 123 S.Ct. 2026.

67. *Id.* at 811, 123 S.Ct. 2026.

68. *Id.* This also forecloses the arguments of Plaintiffs Arneson, Essert, Lee, Richey, and Whitmore whose land could be condemned by the Southern Extension. Clerk's Docket No. 1 at ¶¶ 9–15. Mere potential threats to title are not enough to create harm caused by delaying judicial review.

69. Clerk's Docket No. 12 at Ex. 2 at ¶ 7.

70. *Id.* at 25.

71. *Trustees for Alaska v. Hodel,* 806 F.2d 1378, 1382 (9th Cir.1986).

NEPA. FHWA is still required to consider public comments on the draft EIS, publish a final EIS, and issue a record of decision. Judicial review at this stage in the process would deprive the agency of the opportunity to consider public comments and decide whether it made any mistakes requiring correction. There is still time for the agency to review its past actions and ensure that it is in compliance with all relevant statutes.

In *Ohio Forestry Association*, the Supreme Court discussed how immediate judicial review could hinder an agency's efforts to refine its policies.[72] In that case, the Forest Service had developed a logging plan, but had not yet reached the point of authorizing logging in any specific area.[73] As in the case at hand, "the possibility that further consideration will actually occur before the Plan is implemented is not theoretical, but real."[74] As a result, judicial review at that stage was not desirable because it "would have to take place without benefit of the focus that a particular logging proposal could provide."[75] The same can be said here: more consideration on the potential routes for the Southern Extension will occur and judicial review will be more honed when there is a specific final plan in place, instead of mere speculation concerning what the final agency action will be.

Even though the issues raised by Plaintiffs are primarily legal issues, further factual development would benefit the Court. Review at this point would require the Court to resolve unnecessary and abstract questions. It remains unknown what final action will be recommended by the agency, and it is possible that the agency will recommend the no-action alternative. If the agency chooses an action alternative, it is not yet determined how the project will be funded.

The fact that the two Guidances and the Secretary's waiver are both purely legal issues is not enough to make those claims ripe. First, the Bicycle Guidance is only relevant if the agency funds construction of the Southern Extension as a "bicycle project." If the agency does not rely on 23 U.S.C. § 217, then a court determination of whether the Guidance is a correct interpretation of the statute would merely be an advisory opinion. Second, the Secretary's waiver is only relevant to the current project if the final agency action would otherwise be subject to that prohibition. Without a final action, a court determination of the legality of the Secretary's waiver would again be an advisory opinion. Third, the same arguments apply should the court now rule on the Section 4(f) Guidance as well because this guidance is only relevant if the agency chooses a plan that would authorize federal funding for the Southern Extension to be constructed through a park and is placed under the jurisdiction of the park agency.

FHWA's approval of the TIP is also not ripe for judicial review. As discussed earlier, this is merely a finding that a planning process is in place and that the TIP is consistent with State plans for air pollution abatement. As stated by the United States Court of Appeals for the Ninth Circuit in a case where an agency granted federal funds to the Southern California Rapid Transit District to design, but not construct, a mass transit system for Los Angeles:

> In this instance the only decision that has been made is that the UMT Administration will partially fund preliminary

---

**72.** 523 U.S. 726, 735, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998).

**73.** *Id.* at 729–30, 118 S.Ct. 1665.

**74.** *Id.* at 735, 118 S.Ct. 1665.

**75.** *Id.* at 736, 118 S.Ct. 1665.

design and engineering work. Neither this decision nor the design and engineering work that will follow will have any impact upon appellants in and of themselves. The threat that such an impact will eventually occur is neither immediate nor certain... The process may never be completed.[76]

Here, it is uncertain under what program funding for the Southern Extension would come under, or even whether the agency will decide that the Southern Extension should be built. Meanwhile, merely acknowledging the study of such a plan is not enough to create a ripe controversy.

## V. STANDING

■■■■ To bring a suit in federal court, standing is an essential requirement. The minimum constitutional requirements for standing are:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."[77]

A separate test governs whether associations have standing: "(1) the organization's members must otherwise have had standing to sue on their own; (2) the interests the organization seeks to protect must be germane to its purpose; and (3) neither the asserted claim nor the requested relief may require the members individual participation in the suit."[78] However, while the standard for associational standing is recited by Plaintiffs, neither party argues the issue of standing for the association plaintiffs.

■■■■ Moreover, in a decision cited by neither party, the United States Court of Appeals for the Ninth Circuit stated:

In addition to the constitutional requirements for standing, a petitioner who brings a statutory enforcement action under the APA must meet its statutory requirements for standing. The plaintiff must establish (1) that there has been final agency action adversely affecting the plaintiff, and (2) that, as a result, it suffers legal wrong or that its injury falls within the zone of interests of the statutory provision the plaintiff claims was violated.[79]

While this was also not briefed by the parties, as already discussed, there has not been any final agency action. Thus, Plaintiffs appear to fail under the first requirement. However, the Court does not see a need for further briefing on standing because it has already held that the Plaintiffs lack jurisdiction.

## VI. CONCLUSION

After thorough review of the matter, the Court concludes that the agency actions which are the subject of this dispute are not final for jurisdictional purposes and that the matter is currently not ripe for court intervention. Furthermore, it ap-

---

**76.** *Rapid Transit Advocates, Inc. v. Southern California Rapid Transit District,* 752 F.2d 373, 378 (9th Cir.1985).

**77.** *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations omitted).

**78.** *Harris v. Board of Supervisors,* 366 F.3d 754, 761 (9th Cir.2004).

**79.** *Citizens for Better Forestry v. U.S. Dep't of Agriculture,* 341 F.3d 961, 976 (9th Cir.2003).

pears that given the current posture of the matter, Plaintiffs lack standing to proceed. Defendants' Motion to Dismiss is hereby **GRANTED**.